# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SHOMAS T. WINSTON,

                    Plaintiff,

v.                                                    Case No. 16-CV-95-JPS

DR. MARY SAUVEY,

                    Defendant.                        **ORDER**

## 1.    INTRODUCTION

Plaintiff Shomas Winston ("Winston"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendant Dr. Mary Sauvey ("Dr. Sauvey"), alleging that she was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, Winston complains that Dr. Sauvey mis-diagnosed an injury to his finger and, based on her mis-diagnosis, she improperly treated him.

Winston filed his second motion for summary judgment on October 12, 2016. (Docket #35). Dr. Sauvey responded with her own motion for summary judgment on November 1, 2016. (Docket #42). Both motions are fully briefed and, for the reasons stated below, the Court will grant Dr. Sauvey's motion and deny Winston's motion.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3. RELEVANT FACTS

The relevant facts are drawn from both parties' submissions. Because the Court ultimately finds that Dr. Sauvey is entitled to judgment as a matter of law, it construes the facts and inferences, where applicable, in Winston's favor.

### 3.1 Winston's Pre-2015 Diagnoses and Treatment

Winston was a prisoner at Green Bay Correctional Institution ("GBCI"). (Docket #53 ¶ 1).[1] At all times relevant, Dr. Sauvey was employed

---

[1]Throughout his statement of facts, Winston often fails to cite any evidence at all or, when he does cite evidence, it is merely a general citation to the large body of attachments he provided. *See, e.g.*, (Docket #53 ¶ 11). These practices violate the Court's Local Rules, which clearly set forth the requirements for a party to support a proposed fact in connection with a summary judgment motion. The Court declines to hunt through the voluminous record in this case for support for Winston's statements of fact. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Instead, the Court will disregard any statements that appear to have no readily discernable basis in the record.

as a physician at the GBCI. (Docket #50 ¶ 2).[2] As a physician, she was responsible for providing professional medical services to inmates. *Id.* ¶ 3.[3] In general, Dr. Sauvey attended to the medical needs of inmates, diagnosed and treated illness and injuries, and arranged for professional consultation when warranted. *Id.* ¶ 4.

On December 23, 2013, Winston was seen in the Health Services Unit ("HSU") by nursing staff for a complaint of left 5th finger injury. *Id.* ¶ 5. Winston stated, "I was playing basketball a couple days ago, hurt my finger. Thought it was ok, but it's still swelling up pretty big." *Id.* ¶ 5. On exam, Winston presented in no acute distress with complaints of increased pain to the left 5th digit. *Id.* ¶ 6. The 5th finger was swollen at the area between the middle and proximal phalanx with increased tenderness and Winston was unable to bend it. *Id.* Based on the exam, Winston was given an order for

---

[2]When Winston responded to Dr. Sauvey's proposed findings of fact, he did not maintain her paragraph numbering. Instead, he broke several of her numbered paragraphs into smaller chunks and offered responses to each one. *Compare* (Docket #44 ¶ 1), *with* (Docket #50 ¶¶ 2–3). For the sake of consistency, the Court will refer to Winston's responses whenever possible.

[3]In this and many other instances, Winston objects to Dr. Sauvey's proposed finding of fact because he believes it is not based on admissible evidence. (Docket #50 ¶ 3); (Docket #51 ¶ 18) (Winston complaining that "[i]n Dr. Sauvey's proposed findings of facts [sic], she does not cite to or make any references [sic] to any relevant, admissible evidence to support" those facts). Dr. Sauvey has, however, cited to her affidavit for this proposition, which in turn refers to Winston's medical records, which are attached to her affidavit as exhibits. *Id.*; (Docket #45) (Dr. Sauvey's declaration). Contrary to Winston's belief, her affidavit and the medical records attached to it constitute admissible evidence. Where Winston cites no evidence of his own to controvert Dr. Sauvey's evidence, the Court will reject his attempt at disputing that evidence. *See* Fed. R. Civ. P. 56(c); *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993) (a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material).

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 3 of 35   Document 54

ibuprofen to take as needed as directed, a splint for the finger to leave on as tolerated, and ice for his finger and advised to limit his activity and movement as possible. *Id.* ¶ 7. The nurse practitioner wrote an order at 3:00 p.m. that same day for an x-ray of the finger. *Id.* ¶ 8.

X-rays of the left 5th finger were taken on December 26, 2013. *Id.* ¶ 12.[4] The x-rays showed no acute fracture or other abnormalities, and the conclusion was a normal x-ray examination of the left 5th digit. *Id.* ¶¶ 13–14. Winston was seen by nursing staff in a follow up to a Health Services request ("HSR") dated January 2, 2014 regarding continued pain in his finger and a complaint that he had not be told the results of his recent x-rays. *Id.* ¶ 15. Nursing staff informed him that the results of the x-ray showed no fracture or break of the left hand 5th finger. *Id.* During this visit, the nurse noted that the finger remained swollen between the middle and proximal phalanx with limited range of motion, but Winston was able to bend the finger slightly with pain. *Id.* ¶ 16. The nurse advised Winston to continue to use the splint if it eased discomfort, to try to move the finger as tolerated, to continue the ibuprofen as directed, and made a plan to schedule an appointment for Winston with Dr. Sauvey. *Id.*

On January 21, 2014, Dr. Sauvey examined the injured left 5th finger proximal interphalangeal joint ("PIP") and noted the continued swelling and stiffness. *Id.* ¶ 17. She therefore injected it with a small amount of the corticosteroid Kenalog, which is injected into a joint space to treat

---

[4]Like his complaint about Dr. Sauvey's affidavit, Winston often asserts that certain facts she proffered, including this one, are irrelevant. *See, e.g.,* (Docket #50 ¶ 12). The Court will disregard Winston's legal arguments about the probative weight or legal effect of Dr. Sauvey's factual assertions; such arguments are to be reserved for the parties' memoranda of law, not their factual briefing.

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 4 of 35   Document 54

inflammation, to help reduce swelling and stiffness in the joint, and to aid in healing and restoration of motion. *Id.*

During a February 13, 2014 follow-up exam, Dr. Sauvey noted that the joint was not as sore but was still a bit swollen at the PIP joint. *Id.* ¶ 19. Dr. Sauvey noted that Winston's range of motion had improved, the swelling was improved, and there was minimal tenderness. *Id.* ¶ 20. Dr. Sauvey found that the inflammation of the PIP joint of the left 5th digit had improved, the tendons to that joint were intact, and it appeared that the kenalog injection had worked and Winston was progressing well in his rehabilitation. *Id.* ¶ 21. Dr. Sauvey advised Winston to continue using range-of-motion exercises and nonsteroidal anti-inflammatory drugs ("NSAIDSs"), such as ibuprofen, and to follow up or return to the rehabilitation clinic as needed. *Id.* ¶ 22. Dr. Sauvey ordered that he use the splint for protection if he continued participating in active sports. *Id.* ¶ 23.

Dr. Sauvey followed up with Winston on May 5, 2014, and she noted that there now appeared to be a 10-degree flexion contracture of the PIP on the left 5th finger. *Id.* ¶ 24. A flexion contracture is when a joint is healed and fused, but bent. *Id.* ¶ 25. It indicates that a joint or tendon has been injured and not splinted so it stiffens and heals in a bent fashion. *Id.* The flexion contracture was a new finding and must have developed since the last appointment in February 2014. *Id.* ¶ 26.

Although Winston did not report a re-injury to the medical staff, Dr. Sauvey avers that the flexion contracture likely occurred as a result of a re-injury to that finger. *Id.* ¶¶ 27–28. Dr. Sauvey informed Winston that this appeared to be an old injury, probably months old, complicated by his history of previous trauma. *Id.* ¶ 29. She told him that the flexion contracture could be difficult to completely reverse, but that they could try to splint the

finger in a progressive fashion and perhaps achieve a bit less angulation. *Id.*
¶ 29. Splinting the finger at progressively lower angles would stretch the
flexor tendon and soft tissues to achieve a gradual straightening. *Id.* ¶ 30.
Straightening the finger would also help to prevent re-injury and allow
Winston to buddy tape or splint during active sports more easily. *Id.* ¶ 31.
This was a preventative measure, not a treatment course for an acute injury.
*Id.* Dr. Sauvey avers that she contacted an orthopedic specialist, Dr. O'Brien,
who confirmed that the best course of treatment was to use a splint. *Id.* ¶ 32.

Winston had an appointment in the HSU on June 13, 2014, for
complaints of continued left 5th finger pain with movement, and it was noted
that Winston could bend the 5th finger with some pain and that the knuckle
stuck out. *Id.* ¶ 34. The nurse noted that a splint was ordered on May 5, 2014,
but could not find the splint in the HSU, so she made a plan to reorder the
splint and place Winston on the list to be seen. *Id.* ¶ 36. She advised Winston
to continue using the ibuprofen as directed for pain. *Id.* On June 25, 2014,
Winston was seen in the HSU for a fitting of the splint. *Id.* ¶ 37. The small-
size splint did not fit, so an extra-small splint was ordered. *Id.*

Winston was again seen in the HSU on September 10, 2014, for
complaints of finger swelling and pain in his left 5th finger. *Id.* ¶ 38. The
nurse noted the following: (1) that Winston was concerned that the bone was
closer to the surface of the skin; (2) that he did not feel the injection had really
helped; (3) that the finger was still crooked; (4) that he experienced pain with
bending the finger; and (5) that he was still playing "light ball" at recreation.
*Id.* After this exam, the nurse contacted Dr. Sauvey, who ordered that
Winston's finger splint be re-ordered and the ibuprofen extended. *Id.* ¶ 39.
Dr. Sauvey also directed that Winston be advised not to play ball or other

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 6 of 35   Document 54

jarring exercises at recreation. *Id.* ¶ 39.[5] He was directed to rest and alert HSU staff of any major changes before his next follow up. *Id.* ¶ 40. He was also informed that the discoloration in the finger was not the result of the bone being close to the surface of the skin. *Id.*

### 3.2 Winston's February 2015 Injury, X-Rays, and Diagnosis

Winston claims that on February 3, 2015, he was playing basketball during recreation time. (Docket #53 ¶ 2). During the game, he "hurt his left pinky finger," which became "swollen at the middle." *Id.* He thereafter contacted HSU for treatment. *Id.*; *see also* (Docket #45-1 at 108) (report from November 2015 visit with physical therapist in which Winston reports that his left 5th finger injury came from playing basketball in February 2015). No contemporaneous records from the HSU or elsewhere reflect that such an injury occurred. *Id.* ¶¶ 48–49.

On February 5, 2015, Winston had an appointment with Dr. Sauvey. (Docket #50 ¶ 41). Winston reported that he had continued discomfort in his left 5th finger but was not wearing the splint. *Id.* Dr. Sauvey found the left 5th PIP joint had improved to 5- to 7-degree flexion contracture with minimal PIP joint changes and was still a bit tender to touch. *Id.* ¶ 42. This led Dr. Sauvey to believe that the splinting was a successful treatment strategy. *Id.* ¶ 43. Dr. Sauvey believed that re-injury was a real possibility since Winston had previously reported to the nursing staff that he had continued to play active sports of the kind that had resulted in the original injury. *Id.* ¶ 44.

---

[5] Winston asserts that the nurse's notes from this visit are fabricated, particularly on the issue of whether he continued to play "light ball" at recreation, *see* (Docket #50 ¶ 38), but his speculation that such nefarious conduct occurred is not sufficient on its own to raise a genuine dispute of fact.

Dr. Sauvey ordered another x-ray of the digit to rule out inflammation of the joint, among other things, as a cause of his continued joint tenderness. *Id.* ¶ 45. She also thought Winston might be a candidate for another Kenalog injection for inflammation as she believed he had benefitted from the earlier one. *Id.* ¶ 46. Pending the results of the x-ray, Dr. Sauvey directed Winston to continue to take ibuprofen or naproxen, oral anti-inflammatories, for pain. *Id.* ¶ 47. Winston agreed to that plan. *Id.*

The x-ray ordered by Dr. Sauvey on February 5, 2015 was taken on February 12, 2015. *Id.* ¶ 50. The x-ray showed an age indeterminate avulsion fracture at the PIP joint of the 5th finger, which was new since December 26, 2014. *Id.*[6] The fact that the x-ray noted that the avulsion fracture was "age indeterminate" suggests that the fracture was old, not acute or new. *Id.* ¶ 51. In Winston's opinion, "'age indeterminate' does not necessarily mean [that] the injury was older than February, 2015." *See id.*

It appeared Winston had sustained further trauma at some point, but not recently, to that finger, and Dr. Sauvey assessed him as having a tiny avulsion fracture of left 5th PIP superimposed on his residual flexion contracture based on her review of the x-ray, Winston's history, and her examination. *Id.* ¶ 55.[7] Avulsion or "chip" fractures represent traction injuries when a tendon pulls on chips or small pieces of bone on the edge of the

_____

[6]While the radiology report states that the injury was "new since 12/26/2014," Dr. Sauvey says that the date should be 2013, not 2014. (Docket #50 ¶ 50). This appears to make sense given that the only x-ray in the medical record that was taken on December 26 was taken in 2013 and not 2014. *See* (Docket #45-1 at 136).

[7]As previously discussed, Winston had sustained a second "jam" injury to the PIP joint of the 5th finger sometime between February and May 2014 and had a flexion contracture present on evaluation in May 2014. (Docket #50 ¶ 56).

finger during an acute stress or trauma, such as a "jammed" finger. *Id.* ¶ 53. The majority of such fractures heal over time with simple splinting, and Dr. Sauvey avers that she is not aware that they are ever treated any differently. *Id.* ¶ 54. For his part, Winston claims that he should have been treated with a referral to an outside orthopedic specialist. *Id.* To the best of Dr. Sauvey's knowledge, a certain percentage of avulsion fractures may not re-attach to the bone but do not cause pain or disability. *Id.*

Dr. Sauvey claims that Winston had not been splinting the finger consistently and was still playing active sports in the intervening months. *Id.* ¶ 57. In her view, the avulsion fracture could have happened any time after February 2014; there was no way to accurately date it. *Id.* ¶ 58. Dr. Sauvey felt the fracture would likely eventually resolve, although it might be delayed if he continued to re-injure it. *Id.* According to Dr. Sauvey, the exact date of the avulsion fracture was only significant to the plan of care going forward because, although it was not the source of Winston's deformity, which was already long established, it reinforced the need to buddy tape or splint the finger to allow the chip to heal and to avoid re-injury. *Id.* ¶ 59. Winston does not dispute this opinion about the importance of the date of the fracture; he simply reiterates his view that Dr. Sauvey mis-dated it. *See id.* Dr. Sauvey advised Winston again about the importance of splinting and buddy tape. *Id.*

Dr. Sauvey asserts that the deformity at the PIP joint of Winston's left 5th finger did not cause a significant disability, since he reported that he was able to continue active sports. *Id.* ¶ 60. Winston, however, claims that his injury "prevents [him] from doing normal daily activities and exercises." *Id.* Dr. Sauvey disagrees, noting that in her experience, patients with a significantly tender or actively inflamed joint would have avoided contact

activities, especially activities that resulted in enough force to cause an avulsion fracture. *Id.* ¶ 61.

On February 17, 2015, Winston was seen by an HSU nurse for complaints of finger pain. *Id.* ¶ 62. Winston claimed that he could not sleep and that ibuprofen did not relieve his pain. *Id.* The nurse found the left 5th finger was deformed from the flexion contracture and that there was no redness, but the mid-joint was swollen. *Id.* ¶ 63. Winston was able to move the finger. *Id.* The nurse further noted that he had the splint on during the appointment. *Id.* Based on the exam, she scheduled Winston for an appointment with Dr. Sauvey and made a plan to request that Dr. Sauvey change the ibuprofen to naproxen. *Id.* ¶ 64.

Dr. Sauvey met with Winston next on March 16, 2015. *Id.* ¶ 66. She says that he reported an original "jam" injury to the left 5th finger PIP joint approximately six years prior, in 2009, and noted x-rays had been taken of the left hand and that there was evidence of re-injury and small avulsion fractures that had subsequently healed. *Id.* Winston argues that Dr. Sauvey mis-read the record and that his six-year-old injury was to his left 4th finger, not the left 5th finger. *Id.* There is, in fact, a record from 2009 showing that Winston was diagnosed with a left 4th finger avulsion fracture. (Docket #45-1 at 145).

Dr. Sauvey claims that the record is "unclear" whether, during the March 16 visit, Winston was referring to the left 5th finger or some other finger. (Docket #50 ¶ 67). She states that the medical record shows numerous, recurrent "jam" injuries to Winston's left-hand fingers going back at least six years. *Id.* Winston complains that she simply got her diagnosis wrong by failing to appreciate which left-hand finger was injured and when. *See id.* ¶¶ 67–69. He states that during this appointment, after being told his injury was

recurrent from 2009, he informed Dr. Sauvey that he had never hurt his left 5th finger in 2009, only his left 4th finger. (Docket #53 ¶ 8); (Docket #38 ¶¶ 2–4). According to Winston, they then looked at his 2009 x-rays together and he pointed out on the x-ray that his 2009 injury was to his left 4th finger. (Docket #53 ¶¶ 8–9). She responded that she would "look into the situation." *Id.* ¶ 10. In connection with this suit, Dr. Sauvey maintains that "there is noting in the medical records to indicate [that] I was looking at the wrong x-ray" during this appointment. (Docket #53 ¶¶ 33–36).

Dr. Sauvey avers that Winston's injuries prior to May 2014 healed and resolved with conservative care and did not warrant referral for surgical or orthopedic care. (Docket #50 ¶ 69). She believes that "[t]o the extent that the medical records include a lack of clarity, it is a historical lack of clarity only and would not change [her] diagnosis of Winston's flexion contracture, nor her treatment of the flexion contracture." *Id.* ¶ 70. As noted above, to Dr. Sauvey, the historical information was useful only for understanding the history of Winston's injuries to his left hand, including the fact that prior injuries did not require surgical or orthopedic care. *Id.* ¶ 71. Again, Winston disagrees and considers that later aggravations and inadequate treatment of his injury—to be discussed below—emanated directly from Dr. Sauvey's finger mix-up on this date. *See id.* ¶ 69.

In addition to the x-ray issue, the record reflects that Winston reported at this appointment that he was concerned about the flexion contracture deformity and pain in his left 5th finger. *Id.* ¶ 72. Dr. Sauvey noted that Winston had intermittently splinted the left 5th finger for the past year or so, was instructed in rehabilitative range-of-motion exercises, and had the 2014 Kenalog injection to help with swelling and discomfort. *Id.* ¶ 73. Winston reported no pain relief with naproxen or ibuprofen. *Id.* ¶ 74.

On exam, Dr. Sauvey found that the left 5th PIP joint had a 5- to 7-degree flexion contracture and bony hypertrophy, which is bony overgrowth of tissue associated with a long-standing or repeated injury. *Id.* ¶ 75. The area was painless and there was no evidence of joint space collapse medially or laterally. *Id.* Sensation was intact. *Id.* At this point, Dr. Sauvey believed Winston's flexion contracture was "residual"; that is, at least a year old, which meant it was unlikely to resolve completely. *Id.* ¶ 77. Dr. Sauvey questioned whether Winston was fully complying with her order to wear his splint, so she discontinued the splint as ineffective in avoiding re-injury. *Id.* ¶ 78; (Docket #53 ¶ 17). Winston claims that Dr. Sauvey discontinued use of the metal splint "to avoi[d] reinjury," (Docket #38 ¶ 4), a linguistic distinction that will become important later. Dr. Sauvey avers that the treatment goal now at this time became to prevent further injury with methods such as buddy taping and reducing activities that increased the risk of re-injury. (Docket #50 ¶ 78). She prescribed "APAP," acetaminophen combined with hydrocodone, and meloxicam as anti-inflammatories, and she scheduled an x-ray for six months later for surveillance of the joint for degenerative joint disease. *Id.* ¶ 79.

### 3.3    Winston's Care from March to October 2015

Winston was seen in the HSU on March 17, 2015 for finger pain, and it was noted that he was seen by Dr. Sauvey the day before. *Id.* ¶ 80. The nurse advised Winston on Dr. Sauvey's orders. *Id.* He was seen again on March 31, 2015, for complaints of increased pain in the left 5th PIP. *Id.* ¶ 81. Winston stated that the pain was at a seven out of ten on the pain scale and it was noted that he was unable to totally extend the finger. *Id.* The nurse noted that Winston was evaluated by Dr. Sauvey for the same issues on

March 16, 2015. *Id.* Winston was given APAP and a refill on paper tape, which was used for buddy taping. *Id.* ¶ 82.

On April 20, 2015, Winston was again seen by nursing staff for left 5th finger pain. *Id.* ¶ 83. He claimed that his pain was at a seven out of ten and that medications did not help. *Id.* The nurse noted that Winston stated that he injured the finger in 2009 and that he asserted that it had not felt good since then. *Id.* ¶ 84. The nurse further noted that Winston was in no acute distress but that the left 5th finger was unable to be straightened. *Id.* ¶ 85. It was painful on palpation, and minimal swelling was noted with no erythema—superficial reddening of the skin. *Id.* The nurse advised Winston to use prescribed medications as necessary, use ice and rest as needed. *Id.* ¶ 86. Winston was back in the HSU on May 8, 2015 for continued complaints of pain in the left 5th finger and he stated that the pain was sharp and stinging at about 8.5 out of ten. *Id.* ¶ 87. After an exam, Winston was given another roll of paper tape and informed he was still on the waiting list to see Dr. Sauvey. *Id.*

On May 28, 2015, Dr. Sauvey met with Winston for a follow-up on his left 5th finger injury. *Id.* ¶ 88. During this appointment, Winston complained of continued tenderness and pain and, according to Dr. Sauvey's notes, he requested a splint. *Id.* He reported no further trauma to the finger. *Id.* Dr. Sauvey examined the left 5th finger and found the situation largely unchanged, noting the previously described flexion contracture and bony hypertrophy of the joint with no lesions, erythema, or changes in the overlying skin. *Id.* ¶ 89. Dr. Sauvey assessed Winston with chronic joint pain and discussed conservative measures for treatment, including re-issuing a splint if he would agree to use it as prescribed. *Id.* ¶ 90. Winston agreed with the plan of care and that they would follow up with each other as needed. *Id.*

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 13 of 35   Document 54

Dr. Sauvey continued Winston's APAP and meloxicam prescriptions and also added a topical agent, Volatren gel. *Id.* ¶ 91. To help prevent re-injury, Dr. Sauvey prescribed the splint/buddy tape. *Id.* Winston states that Dr. Sauvey ordered him to wear the splint "without explanation" and despite determining two months earlier, in March 2015, that the splint should be discontinued in order to avoid re-injury. *Id.* ¶ 88.

Winston had yet another appointment with HSU nursing staff on June 19, 2015 for left 5th finger pain. *Id.* ¶ 92. Winston stated that the finger continued to hurt and that it was swollen. *Id.* He claimed to wear the splint daily and that the pain medications were of no help. *Id.* The nurse examined Winston and found he was in no acute distress but that the left 5th finger knuckle was swollen and he was unable to bend the finger. *Id.* ¶ 93. The nurse scheduled Winston for an appointment with Dr. Sauvey. *Id.*

On July 5, 2015, Winston was given a new 5th finger splint after he submitted an HSR stating that his existing splint was broken. *Id.* ¶ 94.[8] X-rays were again taken on July 23, 2015, which showed that Winston's bones were grossly intact without displaced fracture or subluxation, and that the soft tissues were unremarkable. *Id.* ¶ 95.

---

[8] Winston asserts that he was supposed to be seen by Dr. Sauvey on July 3, 2015, but she "cancelled [his] pass" when he arrived at the HSU for the appointment. (Docket #53 ¶ 20). Winston cites no evidence supporting this assertion, and the medical records are bereft of any mention of a July 3 appointment. *See id.* Likewise, he claims he had a second "pass" to see Dr. Sauvey on July 6 which she also denied, but he again cites no evidence substantiating this claim. *See id.* ¶¶ 21–23. It appears from these allegations that Winston became frustrated at a series of alleged appointment cancellations, particularly since he continued to feel pain in his finger. *Id.* ¶¶ 23–24. Yet without evidence—even in the form of sworn statements—to support these factual assertions, the Court cannot accept them.

At an HSU appointment on August 3, 2015, Winston claimed that his left 5th finger still hurt and he wanted to know what the plan was for further treatment. *Id.* ¶ 96. The nurse noted that Winston had his splint on. *Id.* Winston was advised that he was scheduled for an appointment with Dr. Sauvey after additional x-rays were taken, and he was encouraged to continue to buddy tape and not participate in strenuous sports or activities. *Id.* ¶ 97. Winston, however, asserts that he was told not to participate in "daily activities" as well as strenuous sporting activities, thereby demonstrating that his now six-month-old injury was serious and would cause permanent impairment if left untreated. (Docket #53 ¶¶ 26–27). Winston also states that during this visit, the nurse informed him that he may have to wear the splint on his pinky finger "for life." *Id.* ¶ 28.

On August 18, 2015, Winston was provided with a new splint after he returned another broken one. (Docket #50 ¶ 98). On August 19, 2015, Winston received a memo from HSU informing him that because he claimed that his current pain medications were ineffective, his prescriptions for meloxicam and Volatren gel were being replaced with extra-strength Tylenol in a 500 mg dosage four times daily. (Docket #53 ¶ 29); (Docket #37-1 at 18). Further X-rays of the left 5th digit taken on September 9, 2015 showed a normal study with no significant change. (Docket #50 ¶¶ 99–100).

Winston was again seen in the HSU on October 13, 2015. *Id.* ¶ 101. Winston needed another new splint, and he stated that the pain had remained the same since February 2015 and that the APAP made him drowsy. *Id.* He further inquired about what the next step would be in treatment of his finger. *Id.* He had full range of motion to the left 5th finger but the flexion contracture deformity was noted. *Id.* ¶ 102. There was no swelling or bruising in the finger. *Id.* The nurse made a plan to schedule him

for an appointment with Dr. Sauvey that week to go over the x-ray results and plan for further treatment. *Id.* ¶ 103. Winston agreed to this plan. *Id.*

### 3.4 Winston's Care From October 2015 to June 2016

When Winston met with Dr. Sauvey on October 15, 2015, he complained that he was unable to work due to his pain, that he was wearing the splint regularly, and that the APAP was minimally effective for his pain. *Id.* ¶ 104. Winston avers that during this appointment he explained Dr. Sauvey's diagnostic error from February 2015. (Docket #38 ¶ 10). He claims that they discussed how she viewed the wrong 2009 x-ray during that earlier visit rather than his most recent February 2015 x-ray. *Id.* According to Winston, Dr. Sauvey at this time "apologized for the x-ray mix-up regarding [his] 2009 injury and 2015 injury." *Id.*; (Docket #53 ¶ 30).

During this appointment, Dr. Sauvey found no change in Winston's condition. (Docket #50 ¶ 105). His skin was intact, his joint was non-tender to palpation, and the flexion contracture was fixed at about 15 degrees of flexion, and there was no synovitis, increased warmth or redness, soft tissue edema, or swellings. *Id.* Dr. Sauvey also reviewed the x-rays taken on September 9, 2015 during this appointment. *Id.* ¶ 106. The diagnosis was unchanged: flexion contracture of the left 5th PIP joint. *Id.*

Winston's pain was subjective, meaning that observation and palpation revealed no physical tenderness. *Id.* His pain complaints, at this time, were out of proportion to his state of healing and examination findings. *Id.* Nevertheless Dr. Sauvey added another product, topical lidocaine, to try and see if this improved his perception of pain. *Id.* ¶ 107. This would have been effective if he was developing pain in the skin overlying the joint. *Id.* Dr. Sauvey also ordered the physical therapist to evaluate Winston for a neurogenic component to pain—something that she claims is quite rare—and

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 16 of 35   Document 54

she checked with the Psychological Services Unit ("PSU") to see if she could offer him a class on pain coping skills, as he was angry and upset about his finger. *Id.* ¶ 108. Dr. Sauvey advised Winston of the plan of care. *Id.* He asserts that these new treatments were prescribed "suddenly" and represent Dr. Sauvey's reaction to realizing that she had mis-diagnosed his injury eight months prior. *See* (Docket #38 ¶ 11); (Docket #53 ¶¶ 31–32).

By this time, Dr. Sauvey had prescribed, at various points, the following treatments for Winston's inflammation and discomfort: (1) APAP, (2) meloxicam, (3) ibuprofen, (4) naproxen, (5) Volatren gel, (6) lidocaine cream, (7) a physical therapy consult, (8) a PSU consult for pain, (9) a Kenalog injection in January 2014, (10) coping skills, and (11) splinting. (Docket #50 ¶ 109). Dr. Sauvey also continued to prescribe a splint/buddy taping to prevent re-injury. *Id.* In her opinion, most physicians would have ceased treating Winston's flexion contracture at this point as the condition had long been stable and the patient's demands for a cure of what appeared to be a stable, non-disabling condition were unreasonable. *Id.* ¶ 110. Nevertheless, Dr. Sauvey continued to try and help him and on November 4, 2015, Winston was approved for six sessions with the physical therapist. *Id.* ¶ 111. On November 24, 2015, Dr. Sauvey directed Winston to use Theraputty, which had been recommended by the physical therapist, for one month. *Id.* ¶ 112. Theraputty can be used for a variety of finger, hand, and wrist resistive exercises and helps build hand strength. *Id.*

On December 3, 2015, during an appointment with HSU nursing staff for complaints of 5th finger pain, Winston stated that he had been seeing the physical therapist as ordered but the pain would not subside and the trial of Theraputty was not working. *Id.* ¶ 113. The nurse noted that he had an obvious deformity (the flexion contracture) to the left 5th finger, but Winston

was able to make a fist. *Id.* Despite being able to make a fist, Winston stated he was unable to do pushups and other physical activity. *Id.*

Winston stated that past pain medications were all ineffective and that he was "ok" with the deformity being present but could not deal with the pain. *Id.* ¶ 115. The nurse consulted Dr. Sauvey and the physical therapist on the plan of care. *Id.* Winston was informed that the deformity would always be present, that the last two x-rays showed no fracture, and that he may have to live with the pain, but that he should contact the PSU for instruction on pain coping skills. *Id.* ¶ 116.

On February 12, 2016, during an HSU appointment for continued complaints of finger pain, Winston reported that his left 5th finger was at a seven out of ten on the pain scale, sometimes increased to eight or nine when working. *Id.* ¶ 117. He reported that he wore the splint but did not believe it was helping very much, and that Tylenol and lidocaine cream did not help and he would like something more effective. *Id.* ¶ 118. Winston reiterated his concern over the inaccuracy in the March 16, 2015 physician note regarding the time frame of the injury. *Id.* ¶ 119. As he did with Dr. Sauvey in October 2015, he explained to the nurse during this visit that his injury was not six years old. *Id.* Apparently, he was told that "mistakes were made at times." (Docket #45-1 at 27). He also stated, erroneously, that he that never received a Kenalog injection. (Docket #50 ¶ 120).

On exam, Winston was observed to be in no acute distress and was wearing the splint on his left 5th finger. *Id.* ¶ 121. The contracture was noted to the PIP joint but there was no redness, warmth, or edema. *Id.* At this time, progress notes, physical therapy notes, x-rays, and physician notes since the initial injury around December 2013 were reviewed with Winston and a plan was made to schedule an appointment with Dr. Sauvey for re-evaluation. *Id.*

¶ 122. It was noted that the nurse explained to Winston that there may always be discomfort in his 5th finger, and he may have to cope with it. *Id.* ¶ 123.

Winston had corresponded with the PSU and reported to the nurse that the PSU did not have a group focused on teaching pain coping skills. *Id.* ¶ 123; (Docket #53 ¶ 41). The record indicates that no "pain management group" was offered through the PSU at GBCI during this period and that Winston's mental health status would preclude him from inclusion in any such group. (Docket #37-1 at 23–24). Instead, Winston received instruction from the PSU on stress management skills and exercises. *See id.*; (Docket #53 ¶ 42). Winston claims that in response to finding out that the PSU did not offer a pain management group (she was copied on all their letters to Winston), Dr. Sauvey did nothing, thereby prolonging his pain. (Docket #53 ¶ 43).

Dr. Sauvey again met with Winston to evaluate his complaints of left 5th finger pain on February 22, 2016. (Docket #50 ¶ 124). She noted that he stated the injury was still tender when he does push-ups and that he had a prescription for lidocaine and APAP, a splint, and paper tape. *Id.* Winston asserts that he did not tell Dr. Sauvey that his finger hurt only during push-ups, despite what her notes say. *Id.* Dr. Sauvey further noted that Winston reported he had talked to a psychologist, but he did not feel they helped him with pain coping skills. *Id.*

Dr. Sauvey found during her exam that Winston was manipulating his 5th finger by taking the splint off and on, and bending, straightening, and attempting to make a fist without any pain or tenderness. *Id.* ¶ 125. Palpation of the PIP joint showed no increased warmth, tenderness, or erythema. *Id.* Dr. Sauvey confirmed his diagnosis as a post-traumatic flexion contracture

with chronic complaints of pain out of proportion to repeated examinations. *Id.* She started him on a trial of gabapentin for possible neuropathic pain. *Id.* Winston agreed and Dr. Sauvey made a plan to follow up in six months. *Id.* Winston later complained, however, that his receipt of gabapentin was "unexpected," that Dr. Sauvey had not discussed it with him, and that this evidences her deliberate ignorance of his medical needs. *See* (Docket #45-1 at 218); (Docket #50 ¶ 125).

On February 29, 2016, Winston was seen in the HSU for complaints regarding his medications. (Docket #50 ¶ 126). He stated that he had been taking gabapentin since February 25, 2016, and the day after he started taking the gabapentin he started to have chest pain, shortness of breath, and drowsiness. *Id.*; (Docket #53 ¶¶ 44–47). He asked to discontinue the medication. (Docket #50 ¶ 126). Nursing staff noted that he was in no acute distress, his gait was even and steady, and he held a conversation easily with no shortness of breath noted. *Id.* ¶ 127. The gabapentin was discontinued and nursing staff told him to continue his current plan of care as discussed with Dr. Sauvey. *Id.*

On March 23, 2016, Winston sent an HSR to the HSU, claiming that he was still in pain and that the pain was severe enough to disturb his sleep. (Docket #53 ¶ 49); (Docket #37-1 at 31). The nurse who responded to the HSR stated that Winston was scheduled for a "pain clinic" to occur in a few months' time. (Docket #37-1 at 31). The nurse offered in the meantime to see Winston in the HSU for instruction on pain management. *Id.*

On March 28, 2016, Winston was seen in the HSU regarding coping skills for pain, and nursing staff noted that he was in no acute distress and he was wearing his finger splint as directed. *Id.* ¶ 128. There was no swelling, redness or bruising noted but he was unable to completely straighten the

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 20 of 35   Document 54

finger and he had limited range of motion. *Id.* Winston counters that at this visit, he was in pain, he had visible bruising and swelling, and he was unable to use his left hand normally. *Id.* During this visit, Winston was educated to try distraction techniques and relaxation techniques for pain and was further scheduled to see Dr. Sauvey to discuss his plan of care since he no longer was on gabapentin. *Id.* ¶ 129. The notes reflect that Winston agreed to this plan, although Winston points to an inmate complaint he filed in February 2016 that because he had filed this lawsuit against her, he no longer wanted to see Dr. Sauvey. *Id.* The complaint was denied, and the examiner noted that "Dr. Sauvey is the only provider currently at GBCI. If you need to see a specialist—Dr. Sauvey will have to order that." (Docket #45-1 at 222).

On April 2, 2016, Winston was given a new finger splint as the padding on the old one had worn down. (Docket #50 ¶ 130). When Dr. Sauvey met with Winston on April 8, 2016, she noted he had failed multiple medication trials, most recently discontinuing gabapentin. *Id.* ¶ 131. She found at this visit that the 5th finger splint was in place and the left 5th finger PIP joint contracture was at 15 degrees without evidence of synovitis, tenderness, or skin changes. *Id.* ¶ 132. Dr. Sauvey reassured Winston of the benign and likely permanent nature of the flexion contracture. *Id.* Winston requested buddy tape and Dr. Sauvey ordered that he receive paper tape and discontinued the splint. *Id.* ¶ 133. She sent him a memo reminding him to use the paper tape to buddy tape his 5th finger as needed. *Id.* ¶ 134.

On April 19, 2016, Winston filed an HSR in which he continued to complain about finger pain which interrupted his sleep. (Docket #53 ¶ 50); (Docket #37-1 at 32). A nurse responded that Winston should continue to take the extra-strength Tylenol Dr. Sauvey had prescribed and that, if

Winston felt the medication was ineffective, HSU could schedule a "sick call" for him. (Docket #37-1 at 32).

Two days later, on April 21, 2016 Winston was seen by nursing staff for his complaints of left 5th finger pain. *Id.* ¶ 135. The notes reflect that he expressed no change in his pain level and complained of waking up out of sleep because of the pain. *Id.* ¶ 135. Winston denied that any of the medications relieved his pain and said that nothing helped; nursing staff noted that he did not tolerate Tylenol. *Id.* On exam, Winston was found to be in no acute distress, his gait was steady, his left 5th digit was fixed/bent at the center knuckle, he had full range of motion in all other digits, and no redness, bruising, or swelling. *Id.* ¶ 136. Based on this exam, nursing staff directed him to continue to follow the plan of care and use the interventions currently prescribed, such as the buddy tape and APAP, and a follow up was scheduled with Dr. Sauvey. *Id.* ¶ 137.

On May 12, 2016, Winston submitted another HSR about his finger pain and whether he was scheduled for a "pain clinic" as noted in response to his March 23, 2016 HSR. (Docket #53 ¶ 54); (Docket #37-1 at 33). HSU replied that there was "no current order" for Winston to been seen at a "pain clinic" and that Winston was scheduled to have an "on-site MD" appointment in August. (Docket #37-1 at 33). He wrote back in another HSR dated May 18, 2016, this time expressing his frustration that he never received his promised "pain clinic" visit. (Docket #37-1 at 34). He asked to be seen by an "outside specialist." *Id.* The HSU responded, "this week," though it is unclear what was meant by that statement. *See id.*; (Docket #53 ¶ 56). Winston believes that Dr. Sauvey "directed HSU staff to inform [him] he was scheduled to see a pain clinic" in March 2016 but left GBCI without first scheduling such an appointment for him. (Docket #53 ¶ 57).

During an appointment in the HSU on May 19, 2016, Winston stated that his pain was at a seven or eight out of ten and was "throbbing." *Id.* ¶ 138. Winston stated that he was "just frustrated" because the pain continued and he was unable to do things he used to do. *Id.* Nursing staff noted that Winston was in no acute distress, that the left 5th finger medial joint flared at a 90-degree angle, that there was no redness, bruising, or swelling to the area, and that Winston was able to bend/flex further but unable to extend further. *Id.* ¶ 139. Based on the exam, nursing staff assessed him with impaired comfort to the left 5th finger and directed Winston to continue with the currently prescribed interventions of buddy tape and APAP. *Id.* ¶ 140. The nurse's notes reflect that Winston was scheduled to see the physician for pain/finger evaluation, but Winston claims he was not told this and was instead told that Dr. Sauvey was no longer working at GBCI. *Id.*

On June 13, 2016, Winston was transferred to the New Lisbon Correctional Institution. *Id.* ¶ 142. After that time, Dr. Sauvey was no longer Winston's primary care physician and had no further involvement regarding his medical care. *Id.* ¶ 143. According to Winston, Dr. Sauvey's deliberate mistreatment has caused him permanent deformity and chronic pain which persists to this day. (Docket #50 ¶ 146); (Docket #38 ¶ 12) (Winston averring that he can no longer perform push-ups or play sports). Winston avers that some unidentified physician at New Lisbon Correctional Institution has informed him that he needs surgery "following Dr. Sauvey's mistreatment." (Docket #38 ¶ 14); (Docket #53 ¶ 60). None of the records he provided, however, show that any doctor disagreed with Dr. Sauvey's diagnosis or treatment. *See* (Docket #37-1 at 35–37).

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 23 of 35   Document 54

## 4. ANALYSIS

In this suit, Winston broadly claims that Dr. Sauvey's medical care was deficient. According to him, her errors were numerous, but the Court can generally categorize them as a failure to treat his flexion contracture and a failure to manage his pain. (Winston strongly emphasizes the latter throughout his pleadings and motion papers.) Within those overarching categories fall several specific allegations of treatment error.

For instance, Winston appears to believe that Dr. Sauvey misdiagnosed his February 3, 2015 left 5th finger avulsion fracture as a recurring injury from 2009, when in fact the 2009 injury was to Winston's left fourth finger. Though his legal theory is not made clear in his briefing, Winston seems to believe that if this error was not made, his course of treatment would have been different and either his pain, his flexion contracture, or both could have been better remediated. Similarly, Winston faults Dr. Sauvey's decision to implement a metal splint as part of Winston's treatment beginning in May 2015 despite having discontinued use of the same splint two months prior because it created a risk of re-injury. Further, Winston alleges that Dr. Sauvey committed a host of specific errors in treating his ongoing pain, including prescribing ineffectual treatments, delaying his appointments, and failing to schedule him a "pain clinic" appointment to help him learn pain coping skills. None of these alleged errors, considered alone or in combination, presents a triable claim of deliberate indifference to Winston's serious medical needs.

For an Eighth Amendment claim of deliberate indifference to a serious medical need, the plaintiff must prove: (1) an objectively serious medical condition; (2) that the defendant knew of the condition and was deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some

injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).[9] The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The question is not whether the plaintiff believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). Instead, he must prove that the defendant's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). Put differently, the plaintiff must show that his medical providers made treatment decisions "'so dangerous' that the deliberate nature of [their] conduct can be inferred." *Gayton*, 593 F.3d at 623 (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)); *see also Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002) ("Mere dissatisfaction with a particular course of treatment, or even malpractice, does not amount to

---

[9] Dr. Sauvey does not dispute that Winston's finger injury constituted an objectively serious medical condition, and the Court will assume as much for purposes of this analysis.

Case 2:16-cv-00095-JPS    Filed 12/29/16    Page 25 of 35    Document 54

deliberate indifference."). Courts generally defer to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of acceptable courses." *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008). A court must "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999).

The overarching tenor of Winston's response to Dr. Sauvey's motion is that he believes his treatment could have been better, both in terms of pain management and stopping or reversing his flexion contracture. Yet Winston's opinion on his preferred treatment is, without more, inadequate to show that Dr. Sauvey was deliberately indifferent to his needs. *Estate of Cole*, 94 F.3d at 261–62; ; *Reynolds*, 84 F. App'x at 674. Additionally, to the extent Winston asks the Court to view Dr. Sauvey's errors as a constellation of deliberately indifferent treatment, rather than isolated events, this does not save his claim. The Seventh Circuit has instructed that while identifying a series of negligent acts might bear some evidentiary weight on the question of deliberate indifference, it is not conclusive. *Sellers v. Henman*, 41 F.3d 1100, 1103 (7th Cir. 1994) ("[T]he presence of multiple acts of negligence is merely evidentiary; it is not an alternative theory of liability" for medical deliberate indifference). Ultimately, the prison official must be shown to "*know* they are subjecting the plaintiff to an *excessive* risk before they can be found to be violating the Eighth Amendment." *Id.* Multiple negligent acts, close in time, are at best circumstantial evidence of that knowledge. *Id.* As the Seventh Circuit has held, "showing deliberate indifference through a pattern of alleged neglect entails a heavy burden." *Dunigan*, 165 F.3d at 591. The Court will examine

each alleged treatment error below to show why, considered individually or in combination, they do not state a colorable claim for relief.

First is the alleged February 2015 mis-diagnosis of the history of Winston's finger injury. The parties' dispute as to who bore fault for the mis-diagnosis is not material, for even if Dr. Sauvey was in the wrong, her mis-diagnosis does not rise to the level of deliberate indifference.[10] The Seventh Circuit has repeatedly held that mis-diagnosis is not itself a constitutional violation. *See Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th Cir. 2008); *Williams v. Guzman*, 346 F. App'x 102, 106 (7th Cir. 2009); *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). Mis-diagnoses do happen, and they are unfortunate, but they are the stuff of medical negligence claims, not deliberate indifference claims. *Steele v. Choi*, 82 F.3d 175, 178 (7th Cir. 1996) ("*Estelle* requires us to distinguish between 'deliberate indifference to serious medical needs' of prisoners, on the one hand, and 'negligen[ce] in diagnosing or treating a medical condition,' on the other.") (quoting *Estelle*, 429 U.S. at 106); *Snipes*, 95 F.3d at 590 ("[T]he Eighth Amendment is not a vehicle for bringing claims for medical malpractice.").

That principle holds true in this case despite the fact that Winston told Dr. Sauvey that she was wrong and that some other doctor at Winston's new institution may have determined that Winston needs surgery. In *Zackery*, the Seventh Circuit held that a defendant who misdiagnosed an inmate's

---

[10]There is substantial reason to doubt Winston's position. The only evidence he has of a February 3, 2015 injury is his own averment in connection with this case and a physical therapist's November 2015 report of what she was told by Winston about his injury. Winston seems to believe the physical therapist's report is conclusive on this topic, but he fails to appreciate that the therapist seems merely to have written down what he told her. Winston's self-serving statements lack any corroboration in the medical record. Yet for purposes of deciding the present motion, the Court accepts as true Winston's version of events.

Page 27 of 35

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 27 of 35   Document 54

condition, even against the recommendation of another physician, was not deliberately indifferent to the inmate's medical needs. *Zackery*, 299 F. App'x at 601. The Court of Appeals observed that "[a]lthough [the defendant's] diagnosis turned out to be wrong, and [the other physician's] initial suspicion proved correct, a difference of opinion among physicians is insufficient to establish deliberate indifference." *Id.* So too, here, Winston's protestations that Dr. Sauvey wrongly assessed the history of his injury do not show that she was deliberately indifferent to his needs. Likewise, Winston's uncorroborated allegation that some other doctor believes he needs surgery is insufficient. As Dr. Sauvey explained, her treatment decisions would not have been different had she properly appreciated the history of Winston's left 5th finger injury. (Docket #43 at 23); (Docket #52 at 2–3). In her estimation, any inaccuracy in the history of the injury did not matter.

To the extent Winston may suggest that Dr. Sauvey improperly chose conservative treatments over a referral to an outside specialist or surgery, *see* (Docket #47 at 5), this does not support a deliberate indifference claim absent a showing that she knew that her chosen treatment methods would be ineffective. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Winston has provided no evidence coming close to that mark. Rather, the evidence shows that Dr. Sauvey came to a considered treatment decision based on the relevant facts available to her at the time, thereby providing Winston with "adequate, reasonable medical treatment." *Id.* at 1014.

In particular, when the flexion contracture first came to her attention in May 2014, Dr. Sauvey determined, based on its age and consultation with an outside specialist, that the best treatment option was to splint the finger in an effort to progressively reverse the contracture. Winston undermined her treatment by continuing to play basketball at recreation. Indeed, the

focus of his complaint is on the aftermath of his injury in February 2015 during a basketball game. Despite this, Dr. Sauvey noted in February and March 2015 that the flexion contracture had improved somewhat as a result of her prescribed splinting.  By March 2015, Dr. Sauvey concluded that the condition had reached a "residual" stage and could not be completely eliminated. Winston is clearly unhappy with that situation and seems to believe that he should have immediately been given hand surgery. But Dr. Sauvey is not guilty of deliberate indifference for having failed to abide by Winston's desires, *Reynolds*, 84 F. App'x at 674, and he has proffered no facts showing that her diagnosis and treatment were "so inadequate that [they] demonstrated an absence of professional judgment, that is, that no minimally competent professional would have [done the same] under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

Another of Dr. Sauvey's errors, according to Winston, was her flip-flopping on the use of a splint, which Winston claims exacerbated his injury and caused him unnecessary pain. Again, Winston offers no evidence, beyond his own lay opinion, that there is a causal relationship between these things. Moreover, "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'" *Snipes*, 95 F.3d at 592 (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)). Although Winston believes that the splint aggravated his injury, he has no evidence to show that this occurred. Instead, the evidence suggests that the splint was intended to slowly reverse his flexion contracture, which originally developed in 2014. In any event, whether the splint in fact helped is not dispositive of Winston's claim. Dr. Sauvey is not liable here because

she responded reasonably to the risk of harm, even if her treatment did not ultimately allay Winston's condition. *Gayton*, 593 F.3d at 620.

More importantly, the factual lynchpin of this argument—that she stopped the use of the splint in March 2015 because it would increase the risk of re-injury—is undermined by the undisputed facts in the record. Dr. Sauvey's sworn statements in connection with this case, and her notes from the March 16, 2015 appointment, show that she discontinued the splint because it was "ineffective in avoiding reinjury," not because it would itself cause re-injury. *See* (Docket #45-1 at 39); (Docket #53 ¶¶ 15–18). The reason it was ineffective was that Winston was not complying with her order to wear it regularly; instead, he wore it only intermittently. When she decided to give the splint another try in May of that year, it was with the admonition that Winston should actually use it as prescribed. Thus, the record shows that Dr. Sauvey's decision to reinstate use of the splint was not made without the application of medical judgment. *Collignon*, 163 F.3d at 989.

Winston's next asserts that Dr. Sauvey displayed deliberate indifference to his repeated complaints of pain. Yet the undisputed facts indicate that Winston received unparalleled access to medical services at GBCI. During the relevant period, he saw Dr. Sauvey personally at least eight times. Further, he had over twenty individual visits with HSU nursing staff. Between Dr. Sauvey and the HSU staff, Winston was seen approximately once a month for his complaints of pain. At each of his many visits with Dr. Sauvey and the HSU, Winston reiterated his perennial complaint of debilitating pain. As a result of these continued complaints, Dr. Sauvey implemented a plethora of treatment strategies to manage Winston's pain, including numerous and diverse gels, creams, and oral medications, a Kenalog injection, splinting, buddy taping, Theraputty, and physical therapy

sessions. Eventually, she determined that Winston's unabated pain was subjective and was out of proportion to his physical condition. Even at this point, however, she dutifully referred him to the PSU in the hope that he would receive psychological training on coping with his pain. She also continued to try new interventions and medications in an effort to relieve his pain as best she could. In short, she provided years of attentive care and numerous treatment options in an effort to relieve Winston's pain and deformity.

In light of this robust record, the Court cannot say that Dr. Sauvey's course of treatment for Winston's pain was reached in the absence of medical judgment. *Estate of Cole*, 94 F.3d at 261–62. At no time did she doggedly persist in a pain treatment she knew to be ineffective. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition."). Nor did she dismiss his complaints as mere malingering. *Greeno v. Davis*, 414 F.3d 645, 654 (7th Cir. 2005). She changed course again, and again, and again, as Winston's pain appeared to continue unabated. In each instance, the alteration to her treatment plan was made with consideration for the state of Winston's injury and how prior treatments had or had not been effective. Consequently, her pain treatments, even if it was ultimately unsuccessful, did not amount to deliberate indifference. *See Thomas v. Wahl*, 590 F. App'x 621, 624 (7th Cir. 2014) (finding no deliberate indifference where physician engaged in a lengthy and conservative course of pain treatments).

Winston's specific complaints about his pain treatment fare no better. As to Dr. Sauvey's alleged failure to provide a "pain clinic" appointment, the facts and legal theory are hard to parse, particularly since Winston never explains what form he expected this "pain clinic" to take. However, the

record reveals that in October 2015, Dr. Sauvey referred Winston to the PSU to see if it offered pain coping skills instruction. The PSU had no such course or group, so Winston instead received instruction from the PSU on stress management skills and exercises. Dr. Sauvey was copied on the PSU's communications with Winston and thereby learned that the PSU did not enroll him in a pain management class or group. Later, in March 2016, Winston was informed by an HSU nurse that he was scheduled for a "pain clinic" appointment. In May 2016, after he inquired about the appointment further, another HSU nurse told him that no such appointment was scheduled.

In terms of his theory of liability, Winston may be trying to show that Dr. Sauvey was deliberately indifferent because she dropped the ball on scheduling his pain clinic appointment. Yet he also appears to claim that Dr. Sauvey displayed deliberate indifference to his pain when she did nothing in response to learning that the PSU did not offer pain coping skills training. Neither ground supports his claim.

As to the failure to schedule the pain clinic appointment, Winston reads too much into the factual record. At no time did Dr. Sauvey promise that he would be enrolled in a pain management group in the PSU. Instead, the record shows only that she wanted him to inquire with the PSU to see if such a group existed at all. It did not. Winston does not proffer facts showing that Dr. Sauvey could order the PSU to offer such services, and so it is unsurprising that she did nothing more in response to learning that the group did not exist. Additionally, the record shows that Winston was afforded what pain management training the prison was apparently able to provide. Winston was seen in the HSU on March 28, 2016 for education on pain coping skills, including distraction and relaxation techniques. If this was

not the "pain clinic" Winston believes he was promised, he does not explain why, and even a "liberal construction" of his briefing does not fill the gap. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Neither can Dr. Sauvey be faulted for the representations of the HSU in March 2016 about an upcoming pain clinic appointment. Dr. Sauvey is not automatically responsible for the errors of her subordinate staff in the HSU. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise."). Apart from a few bald, unsworn statements that Dr. Sauvey directed the nurse to make a false representation about the upcoming pain clinic appointment, the record does not show that Dr. Sauvey knew that such a representation was made. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (holding that a supervisor is liable for a subordinate's constitutional violation only if she knew about the unconstitutional actions of her subordinate and facilitated it, approved it, condoned it, or turned a blind eye toward it).

Similarly, there is no evidence that Dr. Sauvey caused overlong delay between Winston's medical appointments. While it is true that a delay in treatment can establish deliberate indifference, "'verifying medical evidence' must exist to show how the delay adversely affected a patient's condition." *Reynolds*, 84 F. App'x at 674 (quoting *Langston v. Peters*, 100 F.3d 1235, 1240–41 (7th Cir. 1996)); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Winston provides no evidence that his flexion contracture healed less well because of any gap between his appointments with Dr. Sauvey. *See Davis v. Samalio*, 286 F. App'x 325, 328 (7th Cir. 2008) (rejecting uncorroborated contention that prisoner's broken wrist healed incorrectly as a result of a

delay in treatment). He does, however, point to the severe pain he suffered as a result of the delays. Crediting his representations of pain, as the Court must, the Court can find unconstitutional delay only where the delay was "objectively, sufficiently serious" so as to constitute the "denial of the minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at 834 (quotation omitted). This can occur when prison medical staff ignore a serious, readily treatable medical condition without good reason. *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

As noted above, Winston saw the HSU staff and Dr. Sauvey over once per month during the period in question. There can be no suggestion that they simply ignored his complaints. Further, the delays between appointments cannot be seen as constitutionally infirm since Winston's condition was not so severe as to warrant immediate treatment. *See Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015) (finding that 24-hour delay in medical care was actionable where inmate had a gaping wound). Instead, his pain was a constant feature and one which, as his history showed, could not be readily dissipated. Moreover, beyond Winston's unsupported accusation that Dr. Sauvey arbitrarily cancelled some appointments in July 2015, *see supra* note 8, there is, in reality, no intimation that anyone on the medical staff at GBCI ignored Winston's continued complaints of pain.

On this record, the Court, viewing the course of Winston's care holistically, finds that no reasonable jury could conclude that Dr. Sauvey acted with deliberate indifference to his serious medical needs. *Dunigan*, 165 F.3d at 591. As a result, his claim must be dismissed.

Case 2:16-cv-00095-JPS   Filed 12/29/16   Page 34 of 35   Document 54

## 5. CONCLUSION

On the undisputed facts and the entire record in this case, Winston's claims fail as a matter of law. Therefore, the Court will grant Sauvey's motion for summary judgment, deny Winston's motion for the same, and dismiss Winston's claim with prejudice.

Accordingly,

**IT IS ORDERED** that Plaintiff Shomas T. Winston's second motion for summary judgment (Docket #35) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Dr. Mary Sauvey's motion for summary judgment (Docket #42) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of December, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge